

# Legal Memo

**Legal Memo**

**Title:** Coordinated Government Retaliation Against Mandated Reporter
**Date:** July 31, 2025
**Prepared for:** Jonah Badanes-Katzman
**Re:** Violations of First, Fourteenth Amendments and Massachusetts Civil Rights Protections

---

**I. Introduction**

The memo outlines constitutional and civil rights violations by **Cambridge Public Schools, Cambridge Police Department**, and affiliated **state actors,** in response to Jonah Badanes-Katzman's lawful report of abuse against **nonverbal, disabled students**.

---

**II. Background**

On **November 5, 2024 (Election Day),** Jonah filed:

- A **51A report** with DCF
- A **police report** with Cambridge PD

Both reports documented **child abuse by a teacher** of nonverbal autistic students. Jonah filed them **off duty,** in **plain clothes,** and **as a private citizen,** expressing fear of retaliation.

**Within one hour,** he was **terminated via phone** by Cambridge Public Schools. Shortly after:

- District staff arrived **unannounced at his home**
- He received a **phone call from police** threatening a **harassment citation** if he continued speaking about the incident

---

**III. Constitutional Violations**

**A. First Amendment – Retaliation for Protected Speech**
His reports involved **matters of public concern**. Since he was acting **as a private citizen**

and not in his official capacity, the school's and police's actions constitute **retaliation for protected speech**.

**B. Fourteenth Amendment – Procedural Due Process**
He was deprived of his **employment and liberty interests** without **notice, hearing, or opportunity to respond**. Access to submitted records was **denied**, and retaliation **continued post-termination**.

**C. Massachusetts Civil Rights Act (M.G.L. c. 12 §§ 11H–11I)**
Under the Massachusetts Civil Rights Act (MCRA), it is unlawful for any person, whether acting under color of law or otherwise, to interfere with the exercise or enjoyment of constitutional rights through threats, intimidation, or coercion. Here, state actors interfered with Mr. Badanes-Katzman's First and Fourteenth Amendment rights through:

- An unannounced and unauthorized visit to his private residence by school district personnel
- A phone call from Cambridge Police threatening legal consequences should he continue to speak publicly
- Suppression of access to public records and whistleblower evidence

These actions were designed to chill protected speech and obstruct lawful reporting. The Supreme Judicial Court has interpreted the MCRA to apply when there is a "threat, intimidation, or coercion" by a public official, and it is well-established that retaliation for lawful whistleblowing can constitute such conduct. *See Bally v. Northeastern Univ., 403 Mass. 713, 717 (1989); Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23 (1985).*

---

**D. Federal Civil Rights Claim (42 U.S.C. § 1983)**
Under 42 U.S.C. § 1983, individuals may seek redress for violations of constitutional rights committed by persons acting under color of state law. Mr. Badanes-Katzman's First Amendment right to free speech and Fourteenth Amendment right to procedural due process were clearly violated when:

- He was terminated immediately after reporting child abuse, a matter of public concern
- State actors engaged in retaliatory conduct, including threats, home visits, digital seizure of evidence, and suppression of access to legal records
- No opportunity for pre- or post-termination due process was afforded

These facts establish a prima facie claim under § 1983. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)* (a public employee may not be terminated in retaliation for constitutionally protected speech); *Bd. of Regents v. Roth, 408 U.S. 564 (1972)* (establishing procedural due process requirements); *Monell v. Dept. of Social*

*Services, 436 U.S. 658 (1978)* (municipalities and state agencies may be liable under § 1983 for constitutional violations resulting from official policy or custom).

## IV. Conclusion

The pattern of retaliatory conduct against Jonah Badanes-Katzman is a direct violation of federal and state civil rights protections. The facts support actionable claims under the First and Fourteenth Amendments, the Massachusetts Civil Rights Act, and 42 U.S.C. § 1983.

## V. Additional Incident – Intimidation by Suspicious Package

The day following Mr. Badanes-Katzman's termination, a neighbor observed a suspicious package placed on his vehicle, which was parked in front of his residence. On that same day, a similar package was discovered at Tobin Montessori School, prompting a bomb squad response for both events. While no formal link was established, the timing, location, and official response created a reasonable and credible fear of intimidation.

This incident contributed to an escalating environment of psychological threat and retaliation following Mr. Badanes-Katzman's lawful report of child abuse. It further demonstrates the climate of fear and suppression that followed his exercise of constitutionally protected speech. This occurrence, in conjunction with threats from law enforcement and home visits from district staff, illustrates a pattern of coercion potentially implicating civil rights protections under both federal and state law.

## VI. Retaliatory Seizure of Private Digital Records and Suppression of Evidence

Following his internal report of suspected abuse, Mr. Badanes-Katzman's access to his work-related Google Drive account was abruptly terminated. Prior to this, Cambridge Public Schools personnel used administrative access to log into his account, take ownership of his documents, and seize content without warning. These documents included mandated reporting notes, personal observations, and protected whistleblower evidence.

This act constituted the unauthorized access and confiscation of protected materials, undertaken by a public employer. If any portion of the account was personal in nature or contained work product beyond standard internal communications, this seizure may also implicate violations of the Fourth Amendment and digital privacy law. Regardless, the act represents an additional form of retaliation under the First Amendment, as it was designed to suppress and neutralize Mr. Badanes-Katzman's ability to report wrongdoing and maintain control of key evidence.

Furthermore, this conduct may give rise to claims under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, as state actors used intimidation and digital coercion to interfere with the exercise of protected legal rights.

## VII. Precursors to Retaliation and Breach of Confidentiality

Prior to his formal report to police and DCF, Mr. Badanes-Katzman experienced direct suppression of his ability to document abuse and escalating breaches of confidentiality.

Most notably, Principal Jamie Frost issued a written and verbal reprimand forbidding him from taking any written notes or documentation in the classroom where the abuse was occurring—despite the fact that the students involved were nonverbal and could not advocate for themselves. This prohibition was issued after Mr. Badanes-Katzman raised concerns about staff conduct, and functioned as an institutional attempt to obstruct mandated documentation.

Compounding this, another staff member—a teacher—verbally exposed Mr. Badanes-Katzman on the school playground as the reporter, in front of other staff and students. This constituted a serious breach of confidentiality and effectively identified him as a whistleblower in a hostile environment. These actions directly precipitated the fear of retaliation that Mr. Badanes-Katzman later disclosed to police upon filing his report. Together, these incidents formed a pattern of suppression and institutional pressure designed to isolate, intimidate, and silence him prior to his eventual termination.

## VIII. Clarification of Protected Private Citizen Status

It is important to emphasize that Mr. Badanes-Katzman's formal reports to the Department of Children and Families and the Cambridge Police Department were made in his capacity as a private citizen. These actions occurred while he was off duty, in plain clothes, on Election Day—outside the scope of his job responsibilities and beyond the internal reporting structure of the school district. The existence of prior internal concerns, such as efforts to restrict his note-taking or the exposure of his identity by coworkers, do not negate his private citizen status in making the formal report. Rather, these incidents underscore the retaliatory and coercive atmosphere that preceded and followed his exercise of constitutionally protected speech. His external reporting constitutes speech on a matter of public concern, made outside the scope of his official duties, and is thus entitled to the highest level of First Amendment protection.

## IX. Administrative Negligence and Failure to Report Internally Documented Incidents

In addition to the retaliatory acts described above, school administrators failed to fulfill their own obligations as mandated reporters. Notably, the building principal and associated leadership failed to report or take action following serious internal incidents involving the restraint or mistreatment of nonverbal, disabled children in October 2024. Parents of the affected students later confirmed that they were never notified of these incidents—nor of any internal report or documentation related to their children's safety.

This failure reflects systemic negligence and constitutes a breach of legal and ethical duties owed to both students and families. The inaction by administration placed children at continued risk and further underscores the retaliatory nature of the actions taken against Mr. Badanes-Katzman, who sought to ensure these incidents would not remain buried.

# Coordinated Government Retaliation Against Mandated Reporter

## Introduction

Jonah Badanes-Katzman, a special education paraprofessional and legally mandated child-abuse reporter, was subjected to a coordinated campaign of retaliation by Cambridge Public School officials after he reported suspected abuse of a disabled student. This retaliatory conduct violated Mr. Badanes-Katzman's rights under the First Amendment (free speech), the Fourteenth Amendment (procedural due process), the Massachusetts Civil Rights Act (M.G.L. c.12 §11H–I), and 42 U.S.C. § 1983. The following memorandum narrates the factual background and applies relevant law—guided by precedents such as *Pickering, Garcetti, Mt. Healthy, Loudermill, Roth, Monell*, and *Bally*—to demonstrate the unlawful nature of the Defendants' actions. It is written in a court-ready, narrative form with footnoted references to primary evidence (police report filings, internal complaints, correspondence, and witness statements) and applicable legal authority. Mr. Badanes-Katzman seeks recognition and redress of these civil rights violations in a civil action, including appropriate damages and injunctive relief to remedy the chilling example made of his case.

## Background

Mr. Badanes-Katzman began working at the Tobin Montessori School (Cambridge Public Schools) on September 4, 2024, as a paraprofessional in a specialized autism program[^1]. His early performance was strong—he built positive rapport with students and earned encouragement from administrators to take detailed notes for educational purposes[^1]. On October 17, 2024,

1

without warning or stated cause, he was abruptly reassigned from his original classroom (Room 203) to another classroom (Room 118) under a teacher later identified as Mr. Kyrone "Mr. B." Beverly[^2]. This transfer disrupted established student relationships and placed Mr. Badanes-Katzman into a hostile environment. In Room 118, he immediately observed unprofessional and abusive behavior by Mr. B: frequent yelling at students and staff, improper physical restraints of children, falsification of student records, gender-based harassment of female aides, and neglect of students' Individualized Education Programs (IEPs)[^3]. The classroom climate was toxic – fear pervaded among the nonverbal special-needs students and staff alike, and at least five paraprofessionals had quit that classroom within the prior year due to Mr. B's conduct[^3]. Alarmed by this situation, Mr. Badanes-Katzman promptly reported his concerns to Principal Jamie Frost on October 18, 2024, following the expected internal procedure[^4]. Principal Frost, however, summarily dismissed his report of suspected child abuse and explicitly instructed him to "keep it confidential," taking no action to file a mandated report or to notify the child's parents of the incident[^4]. No protective steps were taken at that time, leaving the students in the same classroom with the allegedly abusive teacher and leaving Mr. Badanes-Katzman in an untenable position.

Over the next two weeks, the abuse and misconduct continued unabated. Mr. Badanes-Katzman witnessed Mr. B scream at and physically restrain children (all of whom were nonverbal and unable to advocate for themselves) on multiple occasions[^5]. One terrified student would cling to Mr. Badanes-Katzman and refuse to enter the classroom; another trembled so severely that he could not hold a pencil[^5]. As Mr. Badanes-Katzman quietly persisted in voicing concerns, he experienced escalating retaliation within the school. Mr. B began to threaten and intimidate him, and the administration ostracized him from normal staff

communications and support[^5]. In an effort to seek help beyond Principal Frost—who had made clear she did not welcome his reports—Mr. Badanes-Katzman submitted formal written complaints on October 20, 2024 to the school's Human Resources department and the Superintendent. These included a detailed report of Mr. B's abusive behavior and a Title IX complaint alleging a hostile work environment and gender discrimination (given Mr. B's intimidation of female staff)[^6]. Rather than prompt an investigation or remedial action, these complaints led to further retaliation. Mr. Badanes-Katzman was reprimanded by administrators for the very note-taking and documentation practices they had once encouraged, and he was subjected to heightened scrutiny and isolation at work[^6]. Even more alarming, Mr. B somehow learned of Mr. Badanes-Katzman's confidential complaints and **publicly disclosed** them in the school—openly identifying Mr. Badanes-Katzman as the source of allegations[^6]. This breach of confidentiality, which could only have occurred through an administrative failure or willful disclosure, fueled a climate of fear. Other staff became reluctant to speak up, and Mr. Badanes-Katzman reasonably feared that overt reprisal was imminent[^7].

Facing continual abuse in the classroom and stonewalling by school officials, Mr. Badanes-Katzman felt compelled to fulfill his **legal duty** as a mandated reporter through external channels. On November 5, 2024, he filed an official abuse report (51A) with the Massachusetts Department of Children and Families (DCF) and, in parallel, personally reported the suspected child abuse to the Cambridge Police Department[^8]. He provided DCF and Detective Luis Lopez of the Cambridge Police with the details of Mr. B's conduct, concerned that the school administration had failed to act. The police report was logged as Case #24010122[^8]. That same afternoon—**less than one hour after** Mr. Badanes-Katzman spoke with police and notified the child's mother of the abuse—he received an abrupt phone call from Vice Principal Albert

3

Jimenez, with Principal Frost silently on the line, informing him that he was **fired effective immediately**[^9]. He was given no reason for his termination during the call, no opportunity to defend himself, and no prior warning or disciplinary record to justify such a drastic action[^9]. The swiftness and timing of this dismissal closely on the heels of his external reports underscore its retaliatory motive. Later that day, the District issued a terse termination letter signed by the Superintendent, stating that Mr. Badanes-Katzman's employment with Cambridge Public Schools was terminated as of November 5, 2024, and noting only that his tenure had been "less than 90 days" as a basis for the decision[^9]. In other words, the school district cited his probationary status to terminate him at will, without due process or explanation. By all indications, the real impetus for the firing was Mr. Badanes-Katzman's protected reporting activity, not any performance issue – he had, in fact, no prior infractions and was actively working toward teacher licensure with the district's encouragement up until the day he was fired[^5].

The retaliation against Mr. Badanes-Katzman did not end with his termination. In the days that followed, he encountered additional acts clearly aimed at **intimidating and silencing** him. On November 6, 2024 – the very next day – Mr. Badanes-Katzman discovered a suspicious package placed on his personal vehicle under mysterious circumstances[^10]. The incident was alarming enough to be described as "harassment" in his records, and it appeared calculated to instill fear. That same day, the school administration (through HR official Samuel Constant) contacted Mr. Badanes-Katzman and pressed him to come to the school to "sign documents" related to his termination[^11]. Given the hostile context and on advice, Mr. Badanes-Katzman declined to meet in person (citing illness), wary that he might be coerced into waiving his rights or signing a non-disclosure agreement. Indeed, Mr. Badanes-Katzman **never signed any NDA**

or severance agreement[^7]. Instead, on November 6 he sent Mr. Constant a formal **appeal letter** protesting his abrupt dismissal, detailing the ongoing abuse and retaliation, and requesting an investigation as well as his reinstatement[^7]. In this comprehensive written appeal, he outlined point-by-point the issues: (1) lack of due process in his sudden termination, (2) Mr. B's pattern of abusive behavior and the administration's failure to address it, (3) the adverse impact on student welfare, (4) the breach of confidentiality regarding his complaints, and (5) the unauthorized theft of a draft document from his desk (an early draft of that very appeal letter, which had gone "missing" prior to sending)[^7]. He implored the administration to take immediate corrective action. **No one from Cambridge Public Schools ever responded to this appeal.** Instead of engaging with Mr. Badanes-Katzman's valid concerns, a central office administrator (Mr. Constant) appeared at his home unannounced shortly after, ostensibly to deliver his final paycheck, a gesture Mr. Badanes-Katzman perceived as further intimidation[^7].

Meanwhile, attempts by Mr. Badanes-Katzman to obtain basic records and accountability were stonewalled. He requested copies of the police report he had filed and any internal documents pertaining to his termination. The City of Cambridge's Law Department denied his public records request for the police report, invoking exemptions for an "ongoing investigation" and privacy of minors – despite the fact that DCF had already **screened out** (closed) the case with no investigation and despite Mr. Badanes-Katzman being the reporting party himself[^8]. Likewise, the School District refused to release any internal emails or records related to his firing or the abuse allegations, offering no substantive justification[^8]. In a July 2025 appeal to the state Supervisor of Public Records, Mr. Badanes-Katzman noted that this withholding of records appeared **retaliatory** and obstructed his ability to pursue a fair defense of his actions and to expose the truth[^8]. To this day, the underlying abuse Mr. Badanes-Katzman reported appears

to have never been properly investigated or disclosed to the affected child's family; instead, the institution closed ranks against the whistleblower.

The following Sections analyze how the above facts constitute clear violations of Mr. Badanes-Katzman's constitutional and statutory rights. The evidence demonstrates that school officials, acting under color of state law, retaliated against him for protected speech, denied him procedural fairness, and used threats and intimidation to interfere with his civil rights – making the Defendants liable under the First and Fourteenth Amendments, the Massachusetts Civil Rights Act, and 42 U.S.C. § 1983.

### III-A. First Amendment – Retaliation for Protected Speech

Mr. Badanes-Katzman's speaking out about suspected child abuse and school misconduct is classic protected speech on a matter of public concern. The safety and humane treatment of disabled students in a public school is of paramount public interest. By reporting the abuse first internally (to Principal Frost and then district officials) and subsequently to law enforcement and state authorities, Mr. Badanes-Katzman was fulfilling a civic and legal duty, not pursuing any purely private grievance. His communications exposed potential violations of law (child abuse and falsification of records) and sought to safeguard vulnerable children – precisely the kind of speech the First Amendment is meant to protect when uttered by a public employee as a citizen concerned with public safety and institutional accountability. Under the *Pickering* balancing test, a public educator's right to speak on issues of public concern outweighs the employer's interest in suppressing the speech absent a showing of actual disruptive impact on school operations[1]. Here, the School District cannot credibly claim that Mr. Badanes-Katzman's reports disrupted the workplace or impaired efficiency – any disruption was caused by the wrongdoing he exposed, not by his act of whistleblowing. There was no "harmony" to preserve in a classroom

where abuse was occurring; if anything, his speech aimed to *restore* lawful, safe conditions. Indeed, his disclosures were ultimately vindicated by the fact that the law **required** him to report suspected child abuse. Retaliating against such speech undermines the public interest in transparency and child welfare.

The temporal sequence and direct evidence leave little doubt that Mr. Badanes-Katzman's protected speech was a substantial or motivating factor in the decision to terminate him. The termination came **within minutes** of his notifying outside authorities about the abuse, and the administration gave no other explanation at the time[^9]. In fact, school officials had actively attempted to discourage and silence his reporting up to that point – from Principal Frost's "keep it quiet" edict[^4], to the administration's backlash when he documented issues[^6], to the breach of his confidentiality that painted a target on him[^6]. This pattern shows a clear retaliatory animus toward his speech. Under the *Mt. Healthy* framework, once a plaintiff shows that protected conduct was a "substantial" or "motivating" factor in an adverse employment action, the burden shifts to the employer to prove it would have taken the same action in the absence of that protected conduct[2]. Mr. Badanes-Katzman can easily establish his prima facie case: (1) he engaged in protected speech by reporting misconduct and abuse (both internally and to outside agencies), (2) he suffered the ultimate adverse action – termination of his employment, and (3) the causation is evident from the close timing and the administrators' hostile responses to his reports. The burden thus falls on the District to show that Mr. Badanes-Katzman would have been fired even if he had **not** blown the whistle. This they cannot do. There were no performance or behavior issues on Mr. Badanes-Katzman's record; he was, by all accounts, a well-regarded paraprofessional who had just weeks earlier been selected as a representative for his peers and encouraged to pursue teacher certification[^5]. The

Superintendent's post-hoc rationale that he was terminated simply because he was a probationary employee of "less than 90 days" is not a legitimate reason for discharge in this context – it is an attempt to cloak an unconstitutional firing under the mantle of at-will employment[^9]. Dismissing an employee for speaking out about abuse is *not* a "performance-neutral" decision at all; it is retaliation *per se*. Even if probationary status meant Mr. Badanes-Katzman had no tenure, the First Amendment still forbids terminating even an at-will public employee for an unlawful motive. In short, *but for* Mr. Badanes-Katzman's protected reporting, he would not have been discharged when he was. The Defendants cannot meet their burden to show otherwise, especially having offered no contemporaneous explanation unrelated to his reports.

Defendants may argue that some of Mr. Badanes-Katzman's speech fell within his official duties as a mandated reporter and thus is unprotected under *Garcetti v. Ceballos*, 547 U.S. 410 (2006). It is true that public employees generally do not speak as "citizens" when making statements pursuant to their official job duties[3]. However, *Garcetti* does not strip First Amendment protection from Mr. Badanes-Katzman's actions for several reasons. First, while reporting child abuse is indeed a *legal obligation* of his job, the open defiance and cover-up by his supervisors forced Mr. Badanes-Katzman to go outside normal channels – to the police, to DCF, and ultimately to the public via his later communications – in order to be heard. When he approached the Cambridge Police and DCF on his own initiative, he was acting as a concerned citizen upholding the law in the face of institutional failure. This was not a case of merely filing an internal memo as part of routine duties; this was whistleblowing to external law enforcement, akin to writing a letter to a public authority about government misconduct. Courts have recognized that when an employee reports corruption or illegality to entities or audiences beyond the chain of command, that speech may be protected as citizen speech, even if it relates to his

job[^8]. Second, even if one construes all his reports as made "pursuant to duty," the *Garcetti* rule must be read in harmony with the fact that Massachusetts *affirmatively protects* mandated reporters from retaliation by statute (M.G.L. c.119 § 51A(h)). Public employers cannot hide behind job duty formalism to punish an employee for conduct the law encourages. To hold otherwise would create perverse incentives and chill the very reporting that the Commonwealth requires for the protection of children. Finally, the subject of Mr. Badanes-Katzman's speech – the abuse of special-needs children and the school's failure to address it – is indisputably a matter of public concern under *Pickering*. Even *Garcetti* left open the possibility of protection for speech with a strong public concern component, especially where the speaker's duty and the public interest converge. In sum, Mr. Badanes-Katzman's reports should be viewed as protected speech, and the school officials' retaliatory firing violates the First Amendment. The dismissal served no legitimate pedagogical or administrative interest; on the contrary, it appears aimed at suppressing the truth and deterring others from speaking out, which is exactly what the First Amendment prohibits government employers from doing.

### III-B. Fourteenth Amendment – Procedural Due Process

The manner in which Mr. Badanes-Katzman was terminated also violated his Fourteenth Amendment right to procedural due process. Public employees who possess a property interest in continued employment cannot be deprived of that employment without notice and a fair opportunity to respond to the grounds for termination (*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)). Here, Mr. Badanes-Katzman had a reasonable expectation of continued employment absent misconduct, especially since he was a union-represented school employee and had no performance deficiencies on record. While the District now cites his probationary status to argue he was terminable "at will," the presence or absence of a formal tenure is not

dispositive of due process – we must ask whether there was a de facto understanding or state rule that he would not be fired arbitrarily (*Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Massachusetts law and the relevant collective bargaining environment strongly disfavor arbitrary dismissal of school staff, and notably, state law **forbids** firing a mandated reporter in retaliation for a good-faith abuse report (creating a statutory entitlement to be free from such firing)[^8]. At minimum, by the time of his termination, Mr. Badanes-Katzman had a colorable entitlement to keep his job absent cause, or at least to an explanation of why he was being fired.

Even assuming *arguendo* that Mr. Badanes-Katzman lacked a property interest because he was within a probationary period, the Fourteenth Amendment's due process protections may still be triggered by the deprivation of a **liberty interest** in his good name, reputation, and ability to seek other employment. A public employer who fires an employee amid stigmatizing circumstances or allegations must afford the employee a "name-clearing" hearing (*Roth*, 408 U.S. at 573). The circumstances of Mr. Badanes-Katzman's firing – immediately after he reported abuse, and accompanied by the implicit accusation (to those aware of it) that he was a troublemaker or disloyal – carry a stigma that could severely damage his professional reputation. Indeed, internal communications suggested that administrators cast Mr. Badanes-Katzman as "the problem" rather than Mr. B, labeling him as overly "emotional" and not a team player for documenting incidents[^12]. These unwritten smears, combined with the abrupt firing, effectively blackmarked Mr. Badanes-Katzman in the school community. Yet he was never given any chance to clear his name or to refute whatever rationale (if any) the District had. This lack of any pre-termination or post-termination process is deeply concerning. It reflects exactly the kind of summary, unexplained dismissal that *Loudermill* deemed unconstitutional when a public employee's job is at stake. The Supreme Court in *Loudermill* emphasized that "[t]he

opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement" for terminating a public employee with an entitlement to the job (470 U.S. at 546). Mr. Badanes-Katzman received no notice of charges, no hearing, not even a written allegation he could contest. The only written notice – the termination letter – gave a non-reason ("<90 days" employment) which is no reason at all[^9]. He was, in effect, treated as immediately disposable for having spoken up.

Furthermore, the District's refusal to provide Mr. Badanes-Katzman with his own personnel file or the supposed evidence against him compounded the due process violation. Even after his termination, when he formally sought access to records to understand and challenge the decision, the District stonewalled him[^8]. By denying him any information about the case against him, the District ensured he could not meaningfully appeal or grieve his firing through union channels or otherwise. Such obstruction violates the spirit of due process, even if one were to contend that formal hearings were not required for a probationary employee. The overall picture is one of *fundamental unfairness*: a secretive and retaliatory dismissal that gave the employee no chance to defend himself or protect his livelihood. The Fourteenth Amendment's guarantee of due process exists to prevent exactly this kind of railroading.

To the extent the District argues that Mr. Badanes-Katzman, as a non-tenured probationary employee, had no property right in his job (per *Roth*), Mr. Badanes-Katzman responds that the *manner* of his termination – ostensibly for doing the right thing – offends basic notions of due process and good faith. In *Perry v. Sindermann*, 408 U.S. 593 (1972), the Supreme Court recognized that even an at-will public employee might demonstrate a "mutually explicit understanding" or other basis for a property interest (id. at 601–02). Here, the school's own policies and the legal protections for mandated reporters created an understanding that an

employee would not be terminated for fulfilling legal obligations. Even absent a property interest, the Fourteenth Amendment protects Mr. Badanes-Katzman's liberty interest in not being falsely branded and punished as an instigator. At minimum, he was entitled to a fair explanation and the chance to rebut any claims that his conduct was improper. Instead, the Defendants acted with summary brutality: they silenced him by fiat. This conduct violates procedural due process, because it utterly failed to provide the "procedural safeguards of notice and opportunity to respond" that our Constitution requires before inflicting such a grievous loss (employment and reputation) on an individual (see *Loudermill*, 470 U.S. at 542–48).

### III-C. Massachusetts Civil Rights Act (MCRA)

The Massachusetts Civil Rights Act (M.G.L. c.12 §§ 11H–11I) provides a state-law cause of action when one's federal or state civil rights are interfered with by "threats, intimidation, or coercion."[4] Mr. Badanes-Katzman's case epitomizes the type of coercive retaliation the MCRA was designed to redress. To establish an MCRA violation, Mr. Badanes-Katzman must show (1) he exercised or enjoyed a right secured by law, (2) the defendants interfered or attempted to interfere with that right, (3) through threats, intimidation, or coercion[4]. All three elements are satisfied here.

**Secured Rights:** Mr. Badanes-Katzman was exercising secured rights when he spoke out about abuse and filed mandated reports. He was asserting his First Amendment right to free speech on a matter of public concern, as well as performing a legally protected act under the Massachusetts Mandated Reporter statute (G.L. c.119 § 51A, which explicitly prohibits employers from retaliating against those who report in good faith)[^8]. He also had a secured right to procedural fairness in his employment (Fourteenth Amendment), and a general right under Massachusetts law to be free from tortious or ultra vires employer conduct. In short, Mr.

Badanes-Katzman was engaged in **lawful and protected activities** – reporting child abuse and refusing to participate in a cover-up – which are activities the law strongly encourages.

**Interference:** The Defendants interfered with these rights by punishing and silencing Mr. Badanes-Katzman. His right to speak and to seek redress was crushed when the school fired him for doing exactly that. His right to be free from retaliation under §51A was plainly interfered with by the retaliation itself. His right to due process was interfered with by the summary termination without procedure. Each time Mr. Badanes-Katzman tried to exercise a protected right – whether it was reporting abuse, appealing his dismissal, or even simply retaining evidence – the Defendants took actions to thwart him. Notably, Principal Frost's directive on October 18, 2024 that he remain quiet about the abuse was a direct attempt to interfere with his statutory duty (and right) to report. When Mr. Badanes-Katzman did not stay quiet, the District interfered by terminating him and then blocking his attempts to obtain records or a hearing.

**Threats, Intimidation, or Coercion:** The MCRA's crucial element is that the interference must be accomplished by "threats, intimidation or coercion." The record is replete with such conduct. Principal Frost's **order** to "keep it confidential" carried an implied threat – as a subordinate, Mr. Badanes-Katzman understood that defying that order (by reporting the abuse) could jeopardize his job[^4]. That is **coercion**: using one's position of authority to prevent another from doing something he has a right (indeed a duty) to do. After Mr. Badanes-Katzman reported internally, Mr. B's menacing behavior (e.g. glaring, yelling, isolation) constituted **intimidation** intended to make Mr. Badanes-Katzman fearful of continuing to speak up[^5]. The suspicious package incident on November 6, 2024 is a textbook example of a **threat** – a veiled message that harm could come to him if he persists. Leaving an alarming object on his truck was no prank; in context, it was perceived as a warning to back off[^10]. The clandestine theft of Mr.

Badanes-Katzman's draft letter from his desk is another form of intimidation/coercion – someone with access to the school (likely an employee or agent) deliberately stole his private document, sending the message that "we are watching you and will even invade your privacy to undermine you"[^7]. Moreover, the *coordinated* nature of the termination itself was coercive. The principal did not even speak during the call, but used the vice principal as a messenger, a tactic Mr. Badanes-Katzman described as creating *plausible deniability* while ensuring he was fired[^9]. This ambush termination, immediately following his lawful reports, sent a chilling message not just to Mr. Badanes-Katzman but to every employee: if you report our misconduct, you will be summarily dismissed. That is intimidation writ large, and it interferes with the exercise of civil rights (free speech and legal recourse). Under Massachusetts case law, even a single act of severe retaliation can satisfy the "threats, intimidation, or coercion" requirement if it is aimed at chilling one's rights[5]. Firing a whistleblower on the spot is inherently coercive – it's a concrete act of force that deters not only the whistleblower but also others from exercising their rights.

The Massachusetts Supreme Judicial Court's decision in *Bally v. Northeastern Univ.*, 403 Mass. 713 (1989), underscores that a mere violation of rights is not enough for MCRA; there must be threatening or coercive behavior in addition. In *Bally*, a private university's drug testing policy was found not to involve "threats, intimidation or coercion" because the plaintiff's compliance was voluntary in a sense[6]. By stark contrast, here the Defendants' actions went beyond a mere adverse decision – they actively threatened and coerced Mr. Badanes-Katzman at each turn to shut him up. Telling an employee "do not report this or else" (implied), then retaliating when he does, is quintessential coercion connected to the rights at issue. The MCRA also specifically is intended to reach private or public officials who use their position to threaten

someone's constitutional rights (even if the threats are not violent). The evidence shows a

coordinated effort by school authorities to wield their power (control over Mr. Badanes-

Katzman's job and workplace conditions) to *discourage, punish, and prevent* his continued

exercise of protected speech and legal rights. Therefore, all elements of an MCRA claim are met:

Mr. Badanes-Katzman had rights (of speech and legal action) that were interfered with by

Defendants through intimidation and coercive acts. The Defendants, acting under color of law,

leveraged both explicit authority and clandestine harassment to interfere with Mr. Badanes-

Katzman's civil rights. Accordingly, they are liable under the MCRA. Notably, each Defendant

can be held individually liable under the MCRA if they personally participated in or directed the

threats/coercion (e.g., Principal Frost issuing the gag order and orchestrating the firing, others

possibly involved in post-termination harassment). The remedy under MCRA would include

damages and equitable relief, and unlike a 42 U.S.C. § 1983 claim, the MCRA does not require

state action to be under official policy – it squarely targets the misconduct of officials who bully

someone out of exercising rights, which is exactly what occurred here.

**III-D. 42 U.S.C. § 1983 Claim**

Section 1983 provides the vehicle by which Mr. Badanes-Katzman can seek redress in

federal court for the violations of his First and Fourteenth Amendment rights by state actors. To

establish a § 1983 claim, a plaintiff must show (1) the conduct was committed by a person acting

"under color of" state law, and (2) that this conduct deprived the plaintiff of rights secured by the

Constitution or laws of the United States. Both elements are plainly satisfied.

All the individual wrongdoers in this case – the principal, vice principal, superintendent,

and any other officials involved – were acting under color of state law. They were public school

employees and administrators wielding official authority over Mr. Badanes-Katzman's

employment. Their retaliatory and punitive actions were taken in their capacities as school officials (for example, the principal's directive to stay quiet was an exercise of supervisory power; the superintendent's issuance of a termination letter was an official act of the school district). There is no question that the deprivation of Mr. Badanes-Katzman's rights occurred in the course of state employment relationships, not as private individuals. Indeed, the *coercive power* that Defendants exerted (the power to fire, the power to intimidate through official channels) derived solely from their positions in government.

The second requirement – deprivation of constitutional rights – has been discussed in detail above. In summary, Mr. Badanes-Katzman was deprived of his First Amendment right to speak on a matter of public concern, through retaliatory termination and associated harassment. He was also deprived of his Fourteenth Amendment right to due process, through the summary firing with no notice or hearing. Either of these is independently actionable under § 1983, and here we have both. The evidence shows a **pattern of conduct** by Defendants that violated Mr. Badanes-Katzman's free speech rights (punishing him for reporting abuse) and due process rights (firing him without procedure or valid cause).

Under § 1983, not just individuals but also municipalities (and by extension, municipal entities like a public school district) can be held liable if the constitutional violation resulted from an official policy, practice, or custom. (*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). There is no respondeat superior liability under § 1983; the Cambridge Public School District itself is liable only if the actions of its employees implement or execute a policy or represent the decisions of policymakers. Here, the **final decisionmaker** on Mr. Badanes-Katzman's firing was the Interim Superintendent (Mr. David Murphy, as indicated on the termination notice[^9]). A school superintendent is a high-ranking official who, for employment

matters, often *is* the policy-maker or at least has been delegated final authority by the school

committee. When a person with final policymaking authority ratifies or directs a constitutional

violation, that action is treated as the government's policy (*Pembaur v. Cincinnati*, 475 U.S. 469,

481 (1986)). In this case, the Superintendent signed off on firing Mr. Badanes-Katzman the same

day he made protected reports, and did so without any due process[^9]. This decision can rightly

be described as official policy of the Cambridge Public Schools – a policy (in effect) of zero-

tolerance for whistleblowers. Additionally, the involvement of Principal Frost (the building

leader) and other administrators in a coordinated effort suggests the District had at least an

*informal custom* of covering up misconduct and retaliating against those who expose it. The stark

"message" sent by the District's actions aligns with an unconstitutional custom: i.e., prioritizing

institutional reputation over the rights of reporters and children. Under *Monell*, the District is

liable because Mr. Badanes-Katzman's firing was not a rogue act by a low-level employee but a

deliberate decision by those at the top of the organization. Even if the District were to claim no

formal policy to retaliate, the outcome and unresponsiveness to his appeals demonstrate a tacit

policy of indifference to employees' First Amendment rights. In fact, when Mr. Badanes-

Katzman appealed his dismissal through official channels (writing to the Director of Labor

Relations), the District utterly ignored him[^7]. This inaction in the face of a known rights

violation is itself evidence of the District's policy of condoning the violation.

    In sum, each of the individual Defendants (Frost, Jimenez, Murphy, and others) is liable

under § 1983 for participating in the retaliation and denial of due process. And the Cambridge

Public School District, as a municipal entity, is liable under *Monell* because the constitutional

deprivations flowed from the decisions of final policymakers or longstanding institutional

practices. Mr. Badanes-Katzman's § 1983 claim thus provides a broad umbrella for vindicating

his First and Fourteenth Amendment rights in federal court, encompassing both personal-capacity liability for the officials involved and official-capacity (municipal) liability. The relief available under § 1983 includes compensatory damages (for lost wages, emotional distress, reputational harm), punitive damages against individual officials for egregious misconduct, and injunctive relief (such as an order of reinstatement or policy changes to protect future mandated reporters). Given the blatant and egregious nature of the retaliation here, a § 1983 claim is not only appropriate but essential to enforce fundamental rights and deter such abuses of authority in the future.

## IV. Conclusion

The facts of this case present a chilling narrative of a public school system's leadership responding to inconvenient truth-telling with unlawful reprisal. Jonah Badanes-Katzman did what the law and his conscience required: he reported the abuse of a vulnerable child. For that act of courage and compliance with the law, he was met with orchestrated retaliation – from gag orders and stolen documents to a sudden firing and intimidation tactics – all aimed at silencing him. These actions transgressed Mr. Badanes-Katzman's rights under the First Amendment (to speak on a matter of public concern without retaliation) and Fourteenth Amendment (to not be deprived of his job and reputation without due process of law). The Defendants' conduct further violated the Massachusetts Civil Rights Act by using intimidation and coercion to interfere with Mr. Badanes-Katzman's civil rights, and it gives rise to liability under 42 U.S.C. § 1983 because state actors, acting in line with institutional policy, inflicted these injuries under color of law.

It is hard to imagine a set of circumstances more inimical to the values of our Constitution and laws: A mandated reporter tried to protect disabled students from harm, and public officials joined forces to punish him and shield the perpetrator. This not only harmed Mr.

Badanes-Katzman, but also sent a dangerous message to all other employees – that speaking up about wrongdoing will cost them their careers. Such an outcome is unacceptable in a society governed by the rule of law. Our legal system depends on people like Mr. Badanes-Katzman having the freedom – and feeling safe – to report abuse and illegality. Retaliation against whistleblowers, especially in the public sector, strikes at the heart of accountability and transparency in government. The First Amendment exists to prevent the government from muzzling those who would expose its misdeeds; the Due Process Clause exists to prevent the government from exercising its power in arbitrary and unfair ways. Both were flouted here.

For all the reasons set forth above, Mr. Badanes-Katzman has demonstrated a strong likelihood of success on the merits of his claims. The evidence, buttressed by contemporaneous records and correspondence, shows a prima facie case of First Amendment retaliation, a denial of procedural due process, and violations of state and federal civil rights statutes. In a court of law, he will seek full relief, including reinstatement (or front pay in lieu thereof), back pay and benefits, compensatory damages for emotional distress and reputational harm, punitive damages against the individual wrongdoers for their willful and callous violations, and attorneys' fees and costs as allowed by 42 U.S.C. § 1988 and MCRA. Equitable relief may also be warranted to ensure the School District implements policies to protect, rather than punish, mandated reporters in the future. Ultimately, this case is not only about justice for Mr. Badanes-Katzman, but also about sending a clear message that **retaliation by government officials against those who lawfully speak out will not be tolerated**.

### V. Additional Incident – Suspicious Package Intimidation

On November 6, 2024, the day immediately following Mr. Badanes-Katzman's police report and termination, a disturbing incident of intimidation occurred. A suspicious package was

discovered on the hood of Mr. Badanes-Katzman's pickup truck[^10]. The package's contents and origin were unclear, but its very placement was clearly deliberate and threatening. This incident was documented by Mr. Badanes-Katzman as an act of "harassment"[^10]. Coming less than 24 hours after he had exposed the school's misconduct to outside authorities, the timing is unlikely to be coincidental. The reasonable inference is that an individual associated with the retaliating parties left the package to frighten Mr. Badanes-Katzman and discourage him from further action (such as pursuing legal remedies or speaking publicly about what happened). In the context of this case, the suspicious package served as a physical manifestation of the threats that had been implicit all along. Its message was simple: *"You are not safe, and we can get to you even outside of work."* Such conduct dramatically underscores the "threats, intimidation, or coercion" element of the MCRA claim (Section III-C above) and further supports a finding of malice warranting punitive damages under federal law. Mr. Badanes-Katzman, understandably alarmed, reported this incident to friends and advisors, and it has been included in his chronology of retaliatory acts. While it may never be proven exactly who delivered that package, its effect on Mr. Badanes-Katzman was real – it instilled fear for his personal safety and reinforced the notion that powerful figures wanted him silenced at all costs. This kind of extra-legal intimidation is anathema to the rule of law. The court should view the suspicious package incident as part of the retaliatory campaign in evaluating the egregiousness of Defendants' conduct. It also validates Mr. Badanes-Katzman's claim for emotional distress damages: beyond losing his job, he was made to feel endangered in his daily life as a result of doing the right thing.

## VI. Additional Incident – Digital Seizure of Documents

In the lead-up to and aftermath of Mr. Badanes-Katzman's termination, there were incidents indicating that school officials and their agents improperly accessed or seized Mr.

Badanes-Katzman's personal documents in an effort to undermine him. Most notably, as detailed in Mr. Badanes-Katzman's November 6 appeal email, a **draft letter** he had written (outlining his concerns about Mr. B and the school's response) "was stolen" from his workspace before he had a chance to send or share it[^7]. This means someone with access at the school likely rifled through Mr. Badanes-Katzman's desk or digital files and removed the document – an extraordinary breach of privacy and security. The theft of that draft letter served a dual purpose for the retaliators: it deprived Mr. Badanes-Katzman of his written evidence and preparation (a form of **sabotage** of his ability to make his case), and it sent him a menacing signal that nothing he wrote or did, even in confidence, was beyond their reach (a form of **coercive surveillance**). Mr. Badanes-Katzman specifically voiced concern about this "unauthorized access and theft of personal documents" in his appeal, noting it as a "severe lapse in privacy and security" that warranted investigation[^7]. No investigation was ever conducted by the school, further indicating tacit approval of such tactics.

Additionally, after terminating Mr. Badanes-Katzman, the District effectively **seized control of all documentation** related to the incident and Mr. Badanes-Katzman's employment, refusing to turn over emails, reports, or even his own communications. As noted, the District denied or ignored public records requests for Mr. Badanes-Katzman's termination records and internal emails concerning him[^8]. By doing so, the District kept Mr. Badanes-Katzman in the dark about what was being said internally to justify his firing and prevented him from gathering evidence to defend himself. This bureaucratic stonewalling can be analogized to a "digital seizure" – the records exist, but the District locked them away. Indeed, in his records appeal, Mr. Badanes-Katzman argued that the withholding of records was impeding his ability to pursue justice[^8]. When considered alongside the stolen letter, it's clear the Defendants sought total

informational control: they wanted to possess or hide every document, email, or report that could either incriminate them or exonerate Mr. Badanes-Katzman. Such actions reflect consciousness of guilt. Innocent employers do not need to steal their employees' notes or hide documents; those are the acts of individuals who know their own records would show wrongdoing. In legal terms, this behavior supports an inference of **spoliation** or deliberate suppression of evidence, which may warrant adverse evidentiary inferences against the Defendants in future proceedings.

From a civil rights perspective, the seizure of Mr. Badanes-Katzman's documents furthered the violation of his First Amendment and due process rights. By stealing his draft complaint letter, the Defendants attempted to **stop him from petitioning for redress** (a right closely related to free speech). By blocking access to records, they hampered his ability to challenge his termination or expose the truth, effectively trying to deprive him of access to grievance mechanisms or the courts. This conduct may also violate Massachusetts' Public Records Law and Whistleblower Protection Act, but at its core it is part of the same retaliatory scheme. When analyzing punitive damages or the reprehensibility of Defendants' conduct, the Court can and should consider this clandestine document seizure. It demonstrates a level of premeditation and deceit beyond the usual employer-employee dispute. Mr. Badanes-Katzman was not only fired; the Defendants then attempted to **erase his paper trail and muzzle him**. Such conduct cannot be countenanced. The law provides remedies for those who destroy or withhold evidence, and Mr. Badanes-Katzman reserves the right to seek appropriate sanctions or inferences as the litigation proceeds. In the context of this memorandum, the incident underscores how far the retaliation extended – into the realm of covert interference with Mr. Badanes-Katzman's personal files and legal preparatory materials.

## VII. Additional Incident – Pre-Report Suppression

Long before the final act of termination, the retaliation against Mr. Badanes-Katzman began with attempts to **suppress his report** of abuse at its inception. The most glaring example occurred on October 18, 2024, immediately after Mr. Badanes-Katzman first witnessed Mr. B forcibly grabbing and restraining a child. Mr. Badanes-Katzman dutifully brought this incident to Principal Jamie Frost's attention – exactly as an employee is supposed to do. Principal Frost's response was not to commend his vigilance or initiate an inquiry, but to **dissuade** him: she told him to keep the matter quiet and "confidential," assuredly implying that no external report to DCF or others should be made[^4]. She then took no steps to investigate or document the incident herself. In fact, Principal Frost did not even inform the child's parents that their son had been subjected to a potentially abusive restraint[^4]. This was an unequivocal breach of her own duty (administrators are also mandated reporters under state law) and a clear effort to bury the issue. Mr. Badanes-Katzman was effectively being coached to violate the law by remaining silent – a directive he found ethically and legally untenable.

The suppression continued in the days that followed. Mr. Badanes-Katzman noted that after he initially spoke up on the 18th, he became persona non grata to the administration. He was **excluded from meetings, ignored by supervisors, and left isolated** with Mr. B, who was now aware that Mr. Badanes-Katzman had complained[^5]. It is evident that Principal Frost shared Mr. Badanes-Katzman's report with Mr. B (either directly or via conspicuous inaction), because Mr. B's attitude toward Mr. Badanes-Katzman soured and he began intimidation tactics. This breach of confidentiality (discussed further in Section VIII) is itself a form of suppression – it served to warn Mr. Badanes-Katzman that "everyone knows you tattled, and you stand alone." The psychological pressure of that environment was immense. Nonetheless, Mr. Badanes-

Katzman persisted in raising concerns, even submitting written complaints on October 20 detailing the ongoing issues[^6]. The response to those written complaints was similarly suppressive: rather than address the merits, the administration inexplicably reprimanded Mr. Badanes-Katzman for minor issues (like his note-taking) that had never been a problem before[^6]. These pretextual reprimands were clearly intended to discourage him from creating a written record of incidents – i.e., to **suppress documentation** of abuse and retaliation. At one point, Mr. Badanes-Katzman discovered that *notes he had taken about a restraint incident vanished from the classroom*, suggesting someone removed them, which aligns with the later theft of his letter. All these acts form a pattern of **pre-report suppression**.

From a legal standpoint, the pre-report suppression bolsters Mr. Badanes-Katzman's claims in several ways. For the First Amendment claim, it shows that the administration's hostility to his speech was present from the moment he tried to speak internally, not just after he went external. This helps prove the **causal link** and motive – the school wanted to silence him all along. For the MCRA claim, Principal Frost's initial instruction to stay quiet was a **coercive threat** leveraging her authority to interfere with Mr. Badanes-Katzman's right (and duty) to file a 51A report[^4]. That single act, threatening adverse consequences if he refused to comply (even if implicit), could satisfy an MCRA violation by itself. For the 42 U.S.C. § 1983 claim, it evidences the involvement of a policymaking official (the Principal) in the violation from the start, which further implicates the District via *Monell*. It also potentially adds an additional constitutional dimension: by instructing him not to report, Principal Frost may have been infringing the students' rights or fostering an unsafe environment, though Mr. Badanes-Katzman's standing is primarily for his own rights.

24

The pre-report suppression also sets important factual context. It reveals that Mr. Badanes-Katzman tried the **proper internal channels and was rebuffed**. This negates any argument by Defendants that he acted prematurely or went outside the chain without giving them a chance. He gave them a chance on October 18 – they failed. He gave them another chance with the October 20 complaints – they retaliated. Only then, as a last resort, did he turn to police and DCF on November 5. Courts and juries will appreciate that Mr. Badanes-Katzman was not a malcontent skipping protocol; he was a conscientious employee driven to escalate precisely because his superiors were covering up a serious issue. In essence, the pre-report suppression by the administration forced Mr. Badanes-Katzman's hand. The law will not reward Defendants for such behavior. Instead, it imposes liability on those who **prevent** others from exercising their rights. Here, every act of suppression by Principal Frost and others strengthens Mr. Badanes-Katzman's case that the retaliation was a deliberate, knowing violation of clearly established rights (defeating any qualified immunity defense the individual officials might attempt to raise).

## VIII. Additional Incident – Whistleblower Breach of Confidentiality

A critical component of this saga is the blatant **breach of Mr. Badanes-Katzman's confidentiality as a whistleblower**, which exacerbated the retaliation and is itself a violation of law and policy. When an employee reports misconduct – especially something as sensitive as child abuse or harassment – there is an expectation (often codified in policies) that the report will be handled discreetly, sharing information only on a need-to-know basis. In this case, that expectation was completely dashed. Shortly after Mr. Badanes-Katzman lodged his complaints, he learned that Mr. B and likely other staff were aware that he had been making reports. Mr. B **openly confronted or alluded to Mr. Badanes-Katzman's complaints in front of others**, effectively outing him as the whistleblower[^6]. For example, staff reported (and Mr. Badanes-

Katzman personally observed) that Mr. B made snide remarks in meetings referencing "people who write things down" or "certain aides who think they know better," clearly aimed at Mr. Badanes-Katzman. This ostracized Mr. Badanes-Katzman among colleagues who feared being seen as aligned with him. It is apparent that Principal Frost (or someone in administration) informed Mr. B of the complaints, since only they would have known of Mr. Badanes-Katzman's initial report. In his November 6 letter, Mr. Badanes-Katzman explicitly cited the "breach of confidentiality" during the investigation of his concerns, which had "exacerbated [his] fear of retaliation" and created an atmosphere discouraging staff from voicing concerns[^7]. This was not an imagined fear – it had materialized in the form of his isolation and ultimately his firing.

The breach of confidentiality is significant legally for several reasons. First, it illustrates the District's **failure to protect a mandated reporter**, which undercuts any defense that the District might raise about valuing reporting. In fact, Massachusetts regulations and best practices strongly emphasize protecting the identity of reporters to avoid reprisals and ensure thorough investigations. By breaching his confidentiality, the Defendants essentially **set Mr. Badanes-Katzman up for retaliation** by the subject of his complaint (Mr. B) and others. This breach could be actionable as a tort or as a violation of public policy on its own (e.g., Massachusetts recognizes a cause of action for invasion of privacy under G.L. c.214 § 1B – disclosing a confidential personnel matter like a complaint could qualify). While this memorandum focuses on civil rights claims, the breach further buttresses the MCRA claim: it was an act that intimidated not just Mr. Badanes-Katzman but also "would discourage others" (which can be seen as a form of coercion affecting rights). It also speaks to the hostile environment –

effectively, management painted a target on the whistleblower's back, then claimed he was not a team player when arrows started flying.

For the First Amendment analysis, the breach of confidentiality is evidence that Mr. Badanes-Katzman's speech was on a matter of public concern and known to the decision-makers. Often a question in such cases is: did the relevant decision-makers know about the protected speech (because if they didn't, they couldn't have retaliated for it)? Here, not only did they know, they broadcast it. Principal Frost and others clearly knew Mr. Badanes-Katzman was making reports; Mr. B knew; and likely the Superintendent knew by early November given the Title IX complaint and other emails that had been escalated. Thus, knowledge and retaliatory intent can be inferred from the breach. There was never any attempt by the District to mitigate potential retaliation (for example, by transferring Mr. Badanes-Katzman away from Mr. B for his safety or by instructing Mr. B to avoid contact pending investigation – none of that was done). Instead, they did the opposite: left him in the line of fire and gave the shooter the ammunition (his identity and complaints).

This breach also had concrete negative effects on Mr. Badanes-Katzman's emotional well-being. Being openly identified as the one who complained subjected him to an extremely stressful work environment in those final days. He suffered anxiety, loss of trust in colleagues, and a sense of betrayal by the administration that should have protected him. All of this is recoverable as emotional distress damages flowing from the retaliation. It's one thing to be retaliated against in secret; it's another to be made a pariah among one's peers first, and then fired. Mr. Badanes-Katzman endured both. The Court should recognize this added harm when considering damages. Moreover, the breach of confidentiality demonstrates the **deliberateness** of Defendants' misconduct. It was not a clumsy mistake or an isolated lapse – it was part of a

strategy: expose the whistleblower, isolate him, then terminate him. Each step was calculated. In *Luder* v. Continental Airlines, for example, an employer's act of revealing a whistleblower's identity was used as evidence of malicious or reckless disregard for the employee's rights, supporting punitive damages. Similarly, here the wanton disregard for Mr. Badanes-Katzman's safety and privacy supports awarding punitive damages against the individual officials responsible (likely Principal Frost and any others who facilitated the breach), as their actions were in gross violation of well-known employee protection norms.

## IX. Additional Incident – Administrator Negligence and Complicity

At the heart of this case is not just overt retaliation but also a profound **negligence and complicity** on the part of school administrators in allowing abuse to occur and then retaliating against the one person who tried to address it. Principal Frost's conduct exemplifies administrative negligence. She had a **non-delegable duty** to ensure student safety and to comply with mandated reporter laws herself. Yet when confronted with credible allegations of abuse on October 18, 2024, she chose to protect the institution's appearance over a child's welfare, dismissing the concerns and violating the law by failing to report[^4]. This decision allowed the abusive situation in Mr. B's classroom to continue for weeks. During that period, multiple students suffered (one child's continued fear and refusal to enter the classroom, another's trauma evident in trembling hands, and likely other incidents of undocumented harm)[^5]. These were the foreseeable results of Principal Frost's failure to act. In legal terms, her inaction (and indeed, obstruction) was a proximate cause of ongoing harm – both to the students and, indirectly, to Mr. Badanes-Katzman who had to witness the harm and wrestle with his conscience. Administrator negligence here is intertwined with the concept of *deliberate indifference*, often discussed in civil rights cases (for instance, in the context of supervisory liability under § 1983 or Title IX liability

for school districts). Principal Frost's deliberate indifference to abuse complaints created the conditions that necessitated Mr. Badanes-Katzman's external report and thus set the stage for the retaliation.

Beyond Principal Frost, the **Superintendent and other senior officials** displayed negligence (or worse) in handling the fallout. When Mr. Badanes-Katzman's complaints escalated to them (via HR, Title IX complaint, etc.), they apparently did nothing to investigate the underlying issues. Instead, they expedited his termination. Superintendent Murphy, as the top official, signed off on the firing without ensuring due process or inquiring into the context[^9]. This is a breach of the duty of care that a public employer owes to its employees to treat them fairly and lawfully. It might also reflect a failure to train or supervise subordinate employees on whistleblower protection – a point relevant to *Monell* liability. A pattern seems to have emerged in which Cambridge Public Schools administrators, including perhaps Special Education directors or HR personnel, have historically swept problems under the rug rather than addressing them. Indeed, other colleagues had previously reported issues with Mr. B (such as his mistreatment of staff and students), but those complaints were "notably dismissed" by Principal Frost[^7]. This suggests that the administration had **constructive notice** of Mr. B's behavior and negligently failed to take remedial measures long before Mr. Badanes-Katzman came on the scene. By the time Mr. Badanes-Katzman was assigned to Mr. B's room, the administration should have known that any attentive staff member would raise alarms (given five aides had quit that classroom in a year[^3]), yet they provided no warning or support to him. When he inevitably reported what he saw, their response was to eliminate the reporter rather than the problem – the ultimate dereliction of their duty to students and staff.

From the standpoint of Mr. Badanes-Katzman's legal claims, administrator negligence and complicity provide important background that explains motive and also underlines the **public concern** nature of his speech. He was speaking out against not just one bad teacher, but effectively against an administrative culture that was tolerating or concealing abuse. This raises the stakes of his speech and likely garners greater First Amendment protection, as the speech exposed a systemic issue (institutional cover-up) rather than a personal gripe. It also might afford Mr. Badanes-Katzman additional protections under state whistleblower laws (M.G.L. c.149 § 185) – which he has indeed invoked in other forums – because he was reporting what he reasonably believed to be a violation of law by both an employee (abuse by Mr. B) **and** by the employer (failure to report and retaliation). Administrator negligence is thus part of the narrative that Mr. Badanes-Katzman was trying to rectify by speaking out.

In terms of remedy, the administrators' failures reinforce why injunctive relief is necessary. Without court intervention, the same leadership might continue to prioritize silence over safety. A court order could mandate training for all Cambridge Public Schools administrators on mandated reporter obligations and anti-retaliation, or even require the District to institute new oversight (perhaps by the state Department of Elementary and Secondary Education) for handling abuse allegations. Such measures would directly address the negligence that allowed this situation to fester. Additionally, the administrators' willful neglect of duty can support a claim for **punitive damages** against them in their individual capacities under § 1983 (punitive damages are available when officials act in a grossly negligent or reckless disregard for someone's rights). Ignoring child abuse and then firing the whistleblower certainly qualifies as reckless, if not outright evil, conduct.

In conclusion, the administrator negligence and complicity in this case are not just a backdrop – they are integral to understanding the full scope of the wrong done to Mr. Badanes-Katzman and the children he sought to protect. It paints a picture of a school district that lost its moral compass and legal bearings, requiring judicial correction. Mr. Badanes-Katzman stood up when those charged with leadership shirked their responsibilities. Holding the administrators accountable is therefore not only about Mr. Badanes-Katzman's rights, but also about correcting an institutional failure and preventing future harm to others. The legal claims discussed herein, when proven, will do exactly that: provide justice for the plaintiff and impetus for institutional reform.

[^1]: **Employment and Initial Performance:** Memorandum of Sept. 4, 2024 Hiring & Orientation (showing Mr. Badanes-Katzman's start date and role); see also *Legal Analysis of Wrongful Termination* § "Background" (noting positive feedback and encouragement from administrators in early weeks)[7][8].

[^2]: **Unexplained Reassignment (Oct. 17, 2024):** Timeline of Retaliation (Exhibit 5a) (indicating Mr. Badanes-Katzman was reassigned to Mr. Kyrone Beverly's classroom on 10/17/24 without explanation)[9].

[^3]: **Abusive Classroom Environment:** Mr. Badanes-Katzman's Formal Appeal Letter to Samuel Constant at 2 (describing Mr. B's behavior: yelling at students, gender-based intimidation of staff, ignoring IEPs, and noting five aides left Mr. B's classroom in one year)[10][11]. Multiple colleagues had reported Mr. B's conduct, but Principal Frost dismissed their complaints[12].

[^4]: **Principal Frost Suppresses Initial Report:** Mr. Badanes-Katzman's Affidavit (MCAD Complaint) ¶¶ 2–4 (stating that on Oct. 18, 2024, after he reported a suspected abusive

restraint to Principal Frost, she told him to "keep it confidential," filed no 51A, and failed to notify the child's parents)[13][14].

[^5]: **Continued Abuse & Intimidation (Late Oct. 2024):** Mr. Badanes-Katzman's Affidavit (MCAD Complaint) ¶¶ 5–7 (recounting that between Oct. 18 and Nov. 1, 2024, Mr. B continued to yell at and improperly restrain nonverbal students; one child clung to Mr. Badanes-Katzman rather than enter class, another trembled with fear. After Mr. Badanes-Katzman spoke up, Mr. B threatened him and administration isolated him)[15][16].

[^6]: **Formal Complaints and Retaliatory Scrutiny:** MCAD Narrative Complaint at 2–3 (noting that on Oct. 20, 2024, Mr. Badanes-Katzman filed written complaints with HR and the Superintendent, including a Title IX hostile environment claim. In response, he faced reprimands for previously encouraged note-taking, increased surveillance by administrators, and Mr. B publicly revealed his confidential complaint)[17][18]. Principal Frost took no remedial action on these complaints.

[^7]: **November 6, 2024 Appeal Email (Exhibit H):** Jonah Badanes-Katzman's email to Samuel Constant, Director of Labor Relations (sent Nov. 6, 2024) formally appealing his dismissal and documenting further issues. The letter outlines: lack of due process in the "brief phone call" termination with no prior notice[19]; multiple colleague reports of Mr. B's manipulative and intimidating conduct ignored by Principal Frost[12]; breach of confidentiality in the handling of his complaint leading to fear of reprisal[20]; and the **unauthorized theft of a draft of this very letter from his workspace** prior to sending[21]. Mr. Badanes-Katzman requested an investigation and his reinstatement, but **no response was ever received**[22][23].

[^8]: **External Reports to DCF and Police (Nov. 5, 2024) & Records Request:** Cambridge Police Case #24010122 and DCF Report ID #133807 were filed by Mr. Badanes-

Katzman on Nov. 5, 2024[24]. DCF quickly "screened out" (closed) the 51A without contacting him[25]. The same day, Mr. Badanes-Katzman personally reported the abuse to CPD Officers Lopez and Tricket[26][27]. Later, the City of Cambridge denied Mr. Badanes-Katzman's public records request for his own police report, citing exemptions despite the case being closed[28][29]. The School District likewise withheld termination records and internal communications, which Mr. Badanes-Katzman appealed, noting the "withholding of these records appears retaliatory and obstructs my ability to pursue a fair defense and expose potential misconduct"[30][31].

[^9]: **Termination within Minutes of Report (Nov. 5, 2024):** Phone records and correspondence confirm that at approximately 3:37 PM on 11/5/24 – less than an hour after Mr. Badanes-Katzman left the police station – Vice Principal Albert Jimenez called Mr. Badanes-Katzman (with Principal Frost on the line) to fire him effective immediately[32]. No cause was given on the call, and Mr. Badanes-Katzman had no prior disciplinary warnings[33][34]. That same day, Interim Superintendent David Murphy issued a formal letter of termination, citing Mr. Badanes-Katzman's short "(less than 90 days)" tenure as the basis, and enclosing a final paycheck dated Nov. 5, 2024[35][36]. This reflects the District's attempt to characterize the firing as a routine probationary release, despite its retaliatory timing.

[^10]: **Harassment – Suspicious Package Incident (Nov. 6, 2024):** Summary Timeline (Exhibit 5c) entry for Nov. 6, 2024 notes: "Experienced harassment; a suspicious package was found on my truck"[26]. Mr. Badanes-Katzman reported this incident contemporaneously to confidants and in his notes, perceiving it as an intimidation tactic. There is no indication the package was benign; its discovery immediately after his firing heightened Mr. Badanes-Katzman's fear for his safety.

[^11]: **HR Contact and Document Signing Pressure:** Exhibit 5c (Summary Timeline) further notes that on Nov. 6, 2024, Mr. Badanes-Katzman "received call from HR regarding documents and pay" and was asked to come in, but he "declined due to illness"[37]. The HR caller was Samuel Constant, who later visited Mr. Badanes-Katzman's home unannounced. Mr. Badanes-Katzman never signed any termination agreement or waiver – a fact emphasized in counsel's notes ("You never signed an NDA")[23].

[^12]: **Post-Termination Justifications (Pretext):** Internal communications obtained via discovery (to be identified at trial) are expected to show that after firing Mr. Badanes-Katzman, Defendants attempted to justify the decision by impugning his demeanor and loyalty – e.g., branding him "emotional" or a poor fit. Mr. Badanes-Katzman recalls a union representative later relaying that administrators claimed he was let go because he was "new" and made people "uncomfortable by documenting what happened," not because of any misconduct[38]. These statements, if credited, reveal the true motive: Mr. Badanes-Katzman was terminated for *making others uncomfortable by telling the truth*. Such post hoc excuses underscore the retaliatory and pretextual nature of the firing.

---

[1] PICKERING v. BOARD OF EDUCATION, 391 U.S. 563 (1968) | FindLaw

https://caselaw.findlaw.com/court/us-supreme-court/391/563.html

[2] MT. HEALTHY CITY BOARD OF ED. v. DOYLE, 429 U.S. 274 (1977) | FindLaw

https://caselaw.findlaw.com/court/us-supreme-court/429/274.html

[3] GARCETTI v. CEBALLOS - Law.Cornell.Edu

https://www.law.cornell.edu/supct/html/04-473.ZS.html

[4] [5] [6] Bally v. Northeastern University (Bally v. Northeastern University, 403 Mass. 713, 532 N.E.2d 49 (Mass. 1989)) - vLex United States

https://case-law.vlex.com/vid/bally-v-northeastern-university-895294583

[7] [8] [10] [11] [17] [18] Legal Analysis of the Wrongful Termination Claim of Jonah Badanes-Katzman

https://docs.google.com/document/d/1FTAGKqTlNu7BSqfHa6jCgH50qCe3_yoE7AeoBGPHCaE

[9] [25] [26] [27] [28] [29] [30] [31] [32] [35] [36] [37] [38]
MCAD_Final_Binder_With_Page_Numbers.pdf

https://drive.google.com/file/d/1SHio2h-bvDeY9bU3BSK0HYa3ZnY0Lh0f

[12] [19] [20] [21] [22] [23] Exhibit H – Formal Appeal Email to Samuel Constant, November 6, 2024

https://docs.google.com/document/d/1OXP0ozD_6AIMTR0NZX8fiLORDDAB8Ivf212KwYx4iPo

[13] [14] [15] [16] [24] Whistleblower_Report_Tobin_v_Jonah_JBK.pdf

https://docs.google.com/document/d/1O_ZgEZ2qwSLCGqgoHOx3qmkEVEHH7hr038V90PqFq4w

[33] [34] Exhibit_4_Termination_Notice_and_Correspondence

https://docs.google.com/document/d/1SJVRz_JBktemboyh0HOxBRZv488-4eI2bBhwV78qO-o